## T. R. WOLFE *v.* T. M. GILMER, and JAMES B. GILMER *v.* T. R. WOLFE.

## L. R. GRIGSBY, Administrator, *v.* J. B. LEE et al., Intervenors.

When persons, married elsewhere, acquire property after they come to reside here, it belongs to the community of acquets; but not that which the husband purchases before he becomes a resident of Louisiana.

When the contract of partnership does not determine the share of each partner in the profits or losses, each one shall he entitled to an equal share of the profits, and must contribute equally to the losses.

APPEAL from the District Court of the Parish of Caddo, *Bullard*, J.[*] *Gilbert* and *Landrum*, for plaintiff. *Spofford* and *Crain*, for defendant. *Lawson*, for intervenors. By the court:

PRESTON, J. This case is novel in its circumstances, and somewhat complicated, on account of the number of parties. The looseness of the transactions between the original parties, the fact that fictitious parties have appeared from the beginning of the business until now, that the litigation is approaching its termination, and that original parties, both nominal and real, are dead, may render it impossible to know exactly the rights of the litigants.

But as far as the facts are disclosed by the record, or perhaps ever can be, we think the district court has come to correct conclusions, and meted out substantial justice to all the parties. If, however, any injustice has been done to the appellant, of one thing we are certain, that it has resulted from the fact of his keeping his property in the names of other persons, we fear for illegal purposes; a practice the more to be reprobated, because it is so common.

In 1834, *Bushrod Jenkins*, then residing in Kentucky, purchased Anderson's Island, near Shreveport, and commenced its improvement as a cotton estate. For that purpose he purchased a number of negroes, particularly a lot of twenty-two, from *William Oldham*, for ten thousand dollars.

In 1836, he brought his family to Louisiana, and became a resident of the State. We may therefore dispose at once of a claim strenuously urged by the counsel of his widow, based upon the assumption, that the land and slaves thus acquired, belonged to the community of acquets which existed between her and her deceased husband. When persons, married elsewhere, acquire property after they come to reside here, it belongs to the community of acquets, but not that which the husband purchases before he becomes a resident of Louisiana.

There is nothing in the case of *Cole's Widow* v. *His Executor*, adverse to this principle. 7 M. R. 41. In that case the husband voluntarily separated from his wife, and established his residence in Louisiana. The true ground of the decision was, that his residence was her residence, and that he might have required her to come to reside in Louisiana, if he had chosen. In this case, the husband did not come to reside in Louisiana, much less his wife, until after his acquisition of the land and slaves erroneously claimed as belonging to the community, in opposition to the fair interpretation of the 2370th article of the Code.

---

[*] This case was decided in 1851.

*Bushrod Jenkins* cultivated the plantation with some success for ten years, increased his property and credit, and became the owner of a joint interest in the town of Shreveport. It was believed by the neighborhood, that he was the sole owner of the plantation and slaves, and other property. The titles to the plantation and slaves, and Shreveport property, were all in his name alone; all transactions growing out of the ownership, were performed by him as owner. In those transactions he contracted numerous debts, and to a large amount, on the credit of the property, because none of his creditors knew that he was not the sole owner.

And yet a paper is produced on this trial, dated at Lexington, Kentucky, in 1835, signed by *Jenkins*, declaring that he owned the plantation and thirty slaves, in partnership with *Lewis K. Grigsby*. The day after its date, it was assigned to *Lewis Grigsby*, of that State, the father-in-law of *Jenkins*, and father of *Lewis K. Grigsby*.

We believe that *Grigsby*, the son, was a partner in the plantation and slaves, from its establishment, and never ceased to be, notwithstanding the assignment.

The instrument shows that he was a partner. He traded in slaves before 1834, and had means. *Jenkins* had but little means, and as has been stated, purchased 22 of the slaves from *William Oldham*, who was trading in partnership with *Grigsby*, in slaves. It seems probable that these slaves belonged to the partnership of *Oldham* and *Grigsby*, were put into the partnership with *Jenkins*, and settled for by *Grigsby* with his partner *Oldham*.

It is proved that *Grigsby* failed in 1834. He had a motive, therefore, for conducting the partnership in the name of *Jenkins* alone, and no doubt took the acknowledgment to which we have referred as a counterletter.

Notwithstanding the assessment, we do not believe his father ever had any interest in the property. It was a private writing, and there is no proof that it was ever delivered to the father. He never took possession of the property, or exercised any control over it. It is not shown that he ever paid anything for the assignment, and his heirs, he being dead, claim nothing under it, or ever heard of it. It is true, a suit to which we shall advert, was commenced in the United States Court in his name, for a settlement with *Jenkins*, but it was commenced, conducted and terminated, entirely by *Grigsby*, the son. It is true, that after *Jenkins'* death, a power of attorney was given by his father to one *Freman*, by which the latter sold the undivided half of the plantation and slaves to *Wolfe*. But *Grigsby*, the son, has had that sale declared fictitious by judgment.

For these reasons, and evidence in the record not adverted to, we do not believe that *Grigsby*, the father, or *Wolfe*, his vendee, ever had any interest in the property, and that though the one, and the curator of the other, are nominal parties to this litigation, that they have no interest in it. The real parties to the suit, and owners of the property, are *Lewis K. Grigsby*, and his sister, *Mrs. Jenkins*, and her minor children; and we shall not complicate the case by reference to any others.

*Jenkins* and *Grigsby* established the plantation with slaves, in the name of *Bushrod Jenkins*, commencing in 1834, and worked it in partnership until 1845. A suit was then instituted in the United States court by *Grigsby* against *Jenkins* for the partition of the property, and settlement of the partnership. But it was compromised, and the partnership extended indefinitely, by a notarial agreement, made on the 25th of November, 1845.

*Jenkins* was murdered in 1846, and the partnership first extended, dissolved by his death. *Thomas M. Gilmore* was appointed his administrator, and has

administered his estate for several years. The property in Shreveport has been divided in kind between *Grigsby* and *Jenkins'* estate. The plantation and slaves have been sold, by consent of all parties. Half the proceeds have been delivered to *Gilmore* for administration; the other half remains in the hands of the sheriff, subject to distribution in this suit. The widow of *Jenkins* claims half of the whole, individually. We have disposed of that claim. She claims half the estate, as tutrix of her minor children, and *Grigsby* claims the other half. The creditors claim to be paid out of the whole estate, and in this *Mrs. Jenkins* supports them. But *Grigsby* insists, that they are to be paid out of the part of *Jenkins* alone. The just settlement of the rights of all the parties, grows principally out of the proper construction of the agreement and compromise between *Jenkins* and *Grigsby*, dated the 25th of November, 1845.

It establishes: 1. That *Jenkins* and *Grigsby* had owned in joint partnership a plantation and slaves, in the parish of Caddo. 2. That a suit had been instituted by *Grigsby*, for a partition of the partnership property, and whatever balance might be found due to him. 3. *Jenkins* acknowledges that *Grigsby* is the owner of an undivided half of the plantation and slaves which are described, and conveys him a title. 4. It is disclosed, and *Jenkins* acknowledges, that *Grigsby* is the owner of one undivided half of his interest in the town of Shreveport. 5. It is provided that the plantation and slaves shall be kept together, and worked in partnership, for the mutual expenses of the joint owners, the expenses of the plantation to be paid out of the proceeds of the crops. 6. *Jenkins* is authorized to sell the lots in Shreveport, provided the proceeds. shall be applied to the payment of the debts, which are particularly enumerated in the agreement. 7. They are declared to be the debts of *Jenkins*, but are to be paid out of the partnership property, or the revenues arising from the same. 8. The debts are then enumerated, and it is again stated, that they are debts previously owing by *Jenkins*, but to be paid out of the revenues and proceeds of the property.

This agreement indicates, that the name of *Jenkins*, as connected with the debts, is used, as it had been from the establishment of the plantation, to represent the partnership. 2. That the enumerated debts were partnership debts. And 3, to be paid out of the revenues, and in default thereof, the proceeds of the sales of the partnership property. And, as it is impossible to believe that *Grigsby* would consent that his revenues should be used, or his property sold to pay debts he did not owe, we are forced to conclude, that they were debts due by him as a partner. And then the exemption contained in these words: "without making *Lewis Grigsby* personally bound for the same in any manner whatsoever," applies appropriately, as it does literally, to *Lewis Grigsby*, the father, in Kentucky, whose name the parties were using fictitiously in a partnership, in which he had no interest whatsoever.

This then is a partnership, to be settled, like any other, between *Grigsby* and his sister, representing her minor children.

The agreement, of which we have extracted the substance, shows sufficiently that they were equal partners in the plantation, slaves and property in Shreveport. No stock account or books being furnished, and neither party pretending to have made, or that the other received advances, their equality of interest in the partnership, and in its losses and profits, is easily presumed. Code, art. 2836. The agreement fixes likewise, with reasonable certainty, the partnership debts to be paid out of the partnership property; and the creditors having become

WOLFE
v.
GILMER.

parties to the liquidation, they must be paid before the surplus is definitely divided.

There are some discrepancies between the amounts of the debts, as stated in the agreement, and the amounts established by the creditors. The statements in the agreement were merely descriptive of what debts were to be paid, and not intended or reasonably expected to be precisely accurate. The discrepancy is so great as to the claims of *Kohn, Daron & Co.* and *J. J. Jackson*, that we would be disposed to yield relief, but for the conviction, as repeated so often, that they were debts of a partnership carried on in the name of *Bushrod Jenkins*, of which *Lewis K. Grigsby* was the secret partner. There is no reason to believe that *Jenkins* intended to deceive, in stating the debts of the partnership of which he had been the manager. Thus the discrepancy in the case of *Kohn, Daron & Co.*, which is much the largest, grew out of the accumulation of interest, that moth of estates, as may be seen at page 682 of 5 Ann. The judgment against him, mentioned in the agreement, did not bear interest, and he probably thought himself exonerated from interest.

There is still less reason for objecting to the debt of *Burne* and *Burnside*, because evidenced by a bill of exchange, while it is stated in the agreement to be a note, or the debt of *Dick* and *Hill*, because proved by a note, whilst the agreement describes it by a bill of exchange. Neither of the parties were subjecting themselves by the agreement to the debts of the other, but both were fixing what were partnership debts, to be paid out of the partnership property, and without which *Jenkins* would not have made titles to *Grigsby*, entered into the compromise, or continued the partnership, but have compelled the partner to establish rights with the same exactitude which the latter now requires.

The same observations apply to the claim of *Stinson*. And under the circumstances, the debt of *Lee* is sufficiently proved. It was acknowledged in the agreement as a small balance of account, but sued for by virtue of a note for two hundred dollars, bearing ten per cent interest. The attorney who brought the suit was well acquainted with *Jenkins*; says that it was a note on *Bushrod Jenkins*, and that it had been lost or mislaid. The advertisement of its loss was admitted. No question was made as to the signature, or we have reason to believe, it would have been more expressly proved by *Mr. Lawson*, the attorney, so well acquainted with *Jenkins*.

As the record showed that *Gilmer*, the administrator, had eight thousand dollars in his hands, proceeding from the revenues of the property, there is no reasonable objection to the decree of the court, directing its appropriation to the debts specified in the agreement, though neither party appears to have specially demanded it. If he has now, or should hereafter have, other funds of the partnership, a like distribution may be made, with which the present does not interfere. The costs of a large record like the present, should not be thrown on the appellees, for unsubstantial reasons.

The judgment of the district court is affirmed, with costs.